UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DARLENE MORRIS, : | |
| Plaintiff, : | |
| v. : | C.A. No. |
| RHODE ISLAND QUALITY : | **JURY TRIAL DEMANDED** |
| INSTITUTE, : | |
| Defendant : | |

## VERIFIED COMPLAINT

### I. Introduction

Plaintiff, Darlene Morris, files this Verified Complaint seeking injunctive relief, attorney's fees and litigation expenses and other equitable relief, including back pay, as well as compensatory damages to remedy the unlawful retaliation she suffered by Defendant, Rhode Island Quality Institute ("RIQI") in violation of the False Claims Act ("FCA"), 31 U.S.C. §3730(h), the Rhode Island False Claims Act ("RIFCA"), §9-1.1-4(g) and the Rhode Island Whistleblowers' Protection Act ("RIWPA"), §28-50-1 *et seq*.

### II. Parties

1.  Darlene Morris ("Ms. Morris") is a resident of the Town of Barrington, County of Bristol, State of Rhode Island. At all times relevant to this action, Ms. Morris was an employee within the meaning of 31 U.S.C. §3730(h) of the FCA and R.I.G.L. §9-1.1-4(g) and §28-14-1(2) of the RIWPA, employed by the Defendant in the State of Rhode Island.

1

2. Defendant RIQI was at all times and continues to be a corporation duly organized and incorporated pursuant to the laws of the State of Rhode Island, with a principal place of business located at 315 Iron Horse Way, Providence, Rhode Island 02908.

### III. Jurisdiction

3. The United States District Court for the District of Rhode Island has federal subject matter jurisdiction over this case under the provisions of 28 U.S.C. §1331 because Plaintiff asserts claims arising under federal law; specifically, the anti-retaliation provision of the FCA, 31 U.S.C. §3730(h). Supplemental jurisdiction over the state law claims set forth herein is predicated on 28 U.S.C. §1367 as they arise out of the same case or controversy.

### IV. Venue

4. Venue is proper in this Court insofar as Defendant is doing business in Rhode Island and therefore is deemed to reside in the District of Rhode Island, in compliance with the requirements set forth in 28 U.S.C. §1391. Moreover, the acts and/or omissions giving rise to the claims asserted here in occurred in the District of Rhode Island

### V. Statement of Facts

5. Darlene Morris (hereinafter "Ms. Morris") began her employment at RIQI in 2012 as the Manager of the Electronic Health Record Adoption Program.

6. From 2013 through her termination of employment in July, 2024, Ms. Morris was repeatedly promoted, holding progressively higher leadership roles at RIQI.

7. In 2013, Ms. Morris was promoted to the position of Senior Manager, Regional Extension Center.

8. In 2014, Ms. Morris was promoted to Director, Regional Extension Center.

9. In 2018, Ms. Morris was promoted to Senior Director, Development & Grants.

10. In about 2019, Ms. Morris' job title was changed to Senior Director, Programs.

11. In 2021, in addition to her duties as Senior Director, Programs, Ms. Morris was tasked with serving as RIQI's HIPAA Privacy Officer.

12. In 2023, Ms. Morris' job title was again changed to Senior Director, Risk Management & Compliance/HIPAA Compliance Officer.

13  At all relevant times herein, Ms. Morris reported directly to Indra Neil Sarkar (hereinafter "Dr. Sarkar"), RIQI's President and CEO.  With respect to issues of compliance, Ms. Morris reported directly to the RIQI Board of Directors.

**Defendant RIQI**

14. Defendant RIQI is a Rhode Island state government contractor.

15.  At all relevant times herein, in accordance with Rhode Island law, RIQI served as the state-designated Regional Health Information Organization (hereinafter "RHIO").

16. At all relevant times herein, in accordance with the terms of a written contract (hereinafter "the State Contract") between the State of Rhode Island, Executive Office of Health and Human Services (hereinafter "EOHHS" or "the State") and RIQI, RIQI served as the state-designated Regional Health Information Organization (hereinafter "RHIO").

17. The Health Information Exchange (hereinafter "HIE") is a voluntary exchange in which confidential health care information of Rhode Island residents is maintained.  The HIE maintains confidential health care information of approximately 550,000 Rhode Island residents or one half of the population of Rhode Island.

18.  At all relevant times herein, pursuant to the terms of the State Contract, RIQI was entrusted with operating and maintaining "CurrentCare", the Rhode Island statewide HIE.

19. At all relevant times, in accordance with the State Contract, RIQI was paid in large part with Medicaid funds. Funding for Medicaid is shared between the federal Government and those states participating in the Medicaid program, in this case the State of Rhode Island.

20. At all relevant times, RIQI has been a sub-recipient of National Institute of Health (hereinafter "NIH") grant funds issued to Brown University as the primary recipient.

21. At all relevant times, pursuant to the terms of a sub-award agreement, Defendant RIQI provided Brown University ("hereinafter "Brown") with HIE data for use in NIH funded research grants by Brown University.

## State Regulation of HIE Data

22. Except as specified in the statute or otherwise permitted by law, the Rhode Island Confidentiality of Health Care Communications and Information Act ("RICHCCIA") prohibits the release or transfer of a patient's "confidential healthcare information" without the written consent of the patient or his or her representative. R.I.G.L. §5-37.3-4(a)(1).

23. Pursuant to the RICHCCIA, "confidential healthcare information" is defined as "all information relating to a patient's healthcare history, diagnosis, condition, treatment, or evaluation obtained from a healthcare provider who has treated the patient." R.I.G.L. §5-37.3-3.

24. The release or transfer of confidential healthcare information for third party use in research is not a permissible use under RICHCCIA. R.I.G.L. §5-37.3-4(b).

25. The Rhode Island Health Information Exchange Act of 2008 was enacted to:

> establish safeguards and confidentiality protections for the HIE in order to improve the quality, safety, and value of health care by promoting interoperability, enhancing electronic communication between providers, and supporting public health goals, while keeping confidential healthcare information secure. R.I.G.L. §5-37.7-2.

26. Pursuant to state regulation, Rhode Islanders who entrust their protected health information ("PHI") to the HIE, do so with the understanding that it will be used to "prevent disease and protect and promote the health and safety of the people of Rhode Island."  See, 216-RICR-10-10-6.1.

27. In contracting with Defendant RIQI as Rhode Island's designated RHIO, the State of Rhode Island relies on the utmost confidence from all parties in the data-sharing practices of the HIE as directed by the State of Rhode Island.

28. R.I.G.L. §5-37.7-7(d) provides as follows:

> Except as specifically provided by state or federal law or this chapter, a patient's confidential healthcare information shall not be accessed by, given, sold, transferred, or in any way relayed from the HIE to any other person or entity.

29. Pursuant to R.I.G.L. §5-37.7-7(d), the use of HIE data for research is not considered a permissible use and as such constitutes a violation of Rhode Island law.

## The State Contract

31. At all relevant times, pursuant to the terms of a State Contract, RIQI was responsible for operating and maintaining the HIE.

32. On information and belief the terms of the relevant State Contract provided in part:

> The Contractor shall take security measures to protect against the improper use, loss, access of and disclosure of any Confidential Information it may receive or have access to under this Agreement as required by this Agreement, the RFP and proposal, or which becomes available to the Contractor in carrying out this Agreement and the RFP and the proposal and agrees to comply with State requirements for safeguarding Confidential Information,  All such information shall be held in strict confidence and protected by the Contractor from unauthorized use and disclosure utilizing same or more effective procedural requirements as are applicable to the State.

5

33. In addition, Part 18.3 of the State Contract provided in part:

   For all Confidential Information under this Agreement, the Contractor must comply with the following privacy and security requirements and obligations:

   a. Ensure that its employees, contractors, and agents implement the appropriate administrative, physical and technical safeguards to protect Confidential Information received by Contractor under this Agreement from loss, theft or inadvertent disclosure.

   ****

   vii. Restrict access to the Confidential Information only to those authorized Contractor employees, subcontractors, and agents who need such Confidential Information to perform their official duties in connection with purposes identified in this Agreement; such restrictions shall include, at a minimum, role-based access that limits access to those individuals who need it to perform their official duties in connection with the uses of Confidential Information authorized in this Agreement ("authorized users"). Contractor shall not use or access Confidential Data for independent projects unrelated to the purposes identified in this Agreement.

34. Part 18.4 of the State Contract provided in part:

   The Contractor expressly agrees and acknowledges that Confidential Information provided to and/or transferred by the State or to which the Contractor has access to for the performance of this Agreement is the sole property of the State and shall not be disclosed and/or used or misused and/or provided and/or accessed by any other individual(s), entity(ies) and/or party(ies) without the express written consent of the State.

35. Pursuant to the terms of the State Contract, the State of Rhode Island retains sole ownership of the HIE data.

36. Prior to July, 2024, pursuant to the terms of the State Contract, RIQI operated both the RHIO and the HIE.

37. In breach of the terms of the State Contract, RIQI granted external access to HIE data without having obtained the express written consent of the State of Rhode Island to do so.

6

38. The unauthorized use of HIE data for research constitutes a material breach of the terms of the State Contract.

39. In breach of the terms of the State contract, RIQI used HIE data for research without having obtained the express written consent of the State of Rhode Island to do so.

40. Beginning July, 2024, RIQI was no longer awarded the state contract to serve as the custodian and operator of the HIE and the state contract to manage the HIE was awarded to another vendor.

### Dr. Sarkar is Hired as RIQI's President and CEO

41. In 2020, after serving as the interim President and CEO, Dr. Sarkar was appointed as RIQI's full-time President and CEO.

42. At all relevant times herein, Dr. Sarkar was employed at Brown University ("Brown") as and an Associate Professor and a leased employee of RIQI.

43. As Senior Director, Ms. Morris was responsible for overseeing the protection of RHIO's confidential HIE data.

44. In early 2023, Dr. Sarkar sought to obtain HIE data reflecting 2.1 million home addresses of Rhode Island patients for the purpose of an independent project supporting research conducted at Brown.

45. Rather than request the data from Ms. Morris as was established RIQI procedure, Dr. Sarkar circumvented Ms. Morris and requested the data directly from RIQI's data department.

46. Troubled by this, Ms. Morris reported the incident to RIQI's counsel.

47. On or about May 3, 2023, Dr. Sarkar made a presentation to the RIQI Board of Directors ("Board") regarding a research study conducted at Brown by a Brown medical student. To conduct the research, Dr. Sarkar relied on the HIE data of over 100,000 patients.

48. EOHHS employees also attended the above-referenced May 3, 2023 presentation.

49. On May 26, 2023, Ms. Morris met with Olivia King ("Ms. King"), State Health IT Coordinator, EOHHS, regarding Dr. Sarkar's use of HIE data for research studies at Brown.

50. Ms. King advised Ms. Morris that Dr. Sarkar's conduct in using the State's HIE data to perform research studies at Brown without obtaining the consent of the State to do so was a violation of state rules and regulations and a breach of the terms of the State Contract.

51. Thereafter, leading up to and culminating in the termination of her employment, Ms. Morris assisted the State; namely EOHHS and RIDOH in their ongoing inquiry and investigation of Dr. Sarkar's misuse of HIE data.

52. In September, 2023, Ms. Morris was tasked with reviewing Dr. Sarkar's employment contract. In doing so, Ms. Morris advised RIQI's counsel of her concern that Dr. Sarkar's position at Brown conflicted with his position and role at RIQI insofar as using HIE data to advance research at Brown violated state law and the terms of the State Contract.

53. By letter dated October 12, 2023, Ms. King and RIDOH Deputy Director, Sandra Powell ("Ms. Powell") advised RIQI that Dr. Sarkar's use of HIE data for research purposes violates state law and is a breach of the terms of the State Contract. They further required that RIQI "Hire or assign 1.0 Full Time Equivalent effort compliance officer …".

54. Thereafter, in addition to her existing job duties as Senior Director, Programs and HIPAA Privacy Officer, Ms. Morris was now tasked with serving as RIQI Compliance Officer.

55. On November 1, 2023, Ms. Morris and Ms. King began Compliance Workgroup meetings to collectively develop a policy on permissible uses of HIE data, to implement new procedures for the review of HIE data requests, and to propose revisions to the regulations regarding the use of HIE data.

56. On November 6, 2023, EOHHS filed a "Breach of Contract Dispute Complaint" against RIQI with the Rhode Island Division of Purchases regarding Dr. Sarkar's utilization of HIE data for research at Brown.

57. On February 22, 2024, Brown submitted a modified student authored manuscript of a study derivative of HIE data to RIQI for review and approval. The manuscript referenced the same research study presented to the Board on May 3, 2023; however, this time, the intended use of the HIE data was different than the use in the earlier study. This new use had not been approved by the State.

58. Despite receiving pressure from Brown to approve the manuscript, Ms. Morris refused to do so. Ms. Morris knew that EOHHS would not approve of the purpose of the research as reflected in the revised manuscript.

59. As such, Ms. Morris reported to EOHHS that Dr. Sarkar was again seeking to use HIE data for an unapproved use and was seeking to bypass State approval to do so.

60. On February 28, 2024, Dr. Sarkar called Ms. Morris and stated that "the boys on the team" were "feeling paranoid" about her meeting alone with the State. He further stated that by referencing "the boys", he was referring to Scott Young ("Mr. Young"), RIQI's Senior Director of Strategy and Charles Dansereau ("Mr. Dansereau"), Senior Director of IT. In fact, Mr. Dansereau advised Ms. Morris that he had no such concern.

61. Shortly thereafter, on February 29, 2024, Dr. Sarkar questioned Ms. Morris about her communications with EOHHS and cautioned Ms. Morris not to engage in any further discussions with EOHHS regarding the use of HIE data.

62. On March 1, 2024, EOHHS advised RIQI that it was suspending its review of requests for HIE data until the third or fourth quarter of 2024.

63. Shortly thereafter, Dr. Sarkar threatened to restrict Ms. Morris' duties and responsibilities at RIQI and to reduce her authority.

64. At about that same time, after learning of the State's decision to place a "hold" on data requests, Dr. Sarkar instructed Ms. Morris that she was no longer permitted to attend HIE Compliance Workgroup meetings with EOHHS unless either he, Mr. Young, or RIQI counsel were also in attendance.

65. The existing State contract was set to expire at the end of June, 2024. Dr. Sarkar advised Ms. Morris that he did not want her to discuss specific terms of the State Contract with EOHSS for fear that in doing so, she might jeopardize RHIO's ability to obtain a new State Contract.

66. Dr. Sarkar further instructed Ms. Morris that she was not to inform EOHHS in advance of a meeting that Dr. Sarkar, Mr. Young and/or RIQI counsel planned to attend.

67. On March 7, 2024, Ms. Morris reported Dr. Sarkar's continuing misuse of HIE data to James Berson ("Mr. Berson"), RIQI's Board member and the Chairman of the Operations Oversight and Audit and Compliance Committees.

68. Ms. Morris described the risks associated with Dr. Sarkar's unlawful use of HIE data. She also notified Mr. Berson of the ongoing retaliation she was enduring. The retaliation included, but was not limited to the following; Ms. Morris was no longer permitted to perform a

number of her job duties; her authority as Senior Director was diminished; Ms. Morris was excluded from meetings, including meetings with state officials; she was denied access to RIQI's database where RIQI maintained its contracts with third parties and the federal NIH sub-award agreements with Brown; and Ms. Morris was increasingly isolated and ignored. Ms. Morris suggested to Mr. Berson a termination of all use of HIE data for research to protect the organization and to safeguard the patient health data.

69. As part of her job duties, Ms. Morris was responsible for managing "Ethical Advocate" an internal on line system for reporting violations of law and ethics. After learning that the Board had been notified of his misuse of HIE data, Dr. Sarkar bypassed Ms. Morris and instructed Ms. Serradas, RIQI's Human Resource Generalist, to determine whether a complaint had been filed via the Ethical Advocate.

70. Shortly thereafter, Dr. Sarkar requested that Ms. Serradas start attending his bi-weekly phone call meetings with Ms. Morris. Dr. Sarkar instructed Ms. Serradas to dial in to the meetings but not announce her attendance on the call. Ms. Serradas refused to do so.

71. By email dated April 8, 2024, Brown advised RIQI that it did not require RIQI's approval to publish manuscripts that relied on HIE data provided by Dr. Sarkar, including the above-referenced revised manuscript.

72. In fact, Brown advised RIQI that if RIQI did not approve Brown's request to publish the revised manuscript within the next two weeks, the manuscript would be published regardless of RIQI's approval.

73. In a feigned attempt to distance himself from Brown's decision to publish the manuscript regardless of RIQI's approval, Dr. Sarkar instructed Ms. Morris to advise Ms. King at EOHHS of Brown's decision. Dr. Sarkar instructed Ms. Morris to provide him and counsel

with a draft of the email she planned to send to Ms. King. After doing so, Dr. Sarkar provided Ms. Morris was revisions to the email and instructed her to send the revised email to Ms. King.

74. Thereafter, the retaliation against Ms. Morris continued. By email dated May 2, 2024, Dr. Sarkar instructed Ms. Morris that, until further notice, she was no longer permitted to attend meetings with Ms. King.

75. At a May 6, 2024 RIQI Senior Leadership Team meeting, Dr. Sarkar advised Ms. Morris that she was no longer permitted to work with the State on developing a permissible use policy for HIE data. Dr. Sarkar further advised Ms. Morris that she was no longer permitted to assist the State in developing procedures to approve requests to use HIE data. Dr. Sarkar advised Ms. Morris that any communication with Ms. King must be done via email; that Ms. Morris was no longer allowed to propose revisions to state regulations regarding the use of HIE data and that, going forward, any proposed revisions to state regulations regarding the use of HIE data required approval by Mr. Young.

76. On May 7, 2024, when Ms. Morris advised Ms. King of Dr. Sarkar's May 2 and 6, 2024 instructions, Ms. King responded, "That's unacceptable."

77. On May 15, 2024, Ms. Morris again met with Mr. Berson regarding Dr. Sarkar's continuing misuse of HIE data. She advised Mr. Berson of the escalating risk his misuse posed to RIQI; that the retaliatory restrictions placed on her were interfering with and obstructing her ability, as RIQI's Compliance Officer, to properly perform her job; and she reported the ongoing retaliation she was continuing to endure.

78. Ms. Morris proposed that the RIQI Board Audit and Compliance Committee be notified of any further requests to use HIE data for research. Ms. Morris' proposal was ignored. Similarly, her reports of ongoing retaliation were also ignored.

79. By letter dated May 23, 2024, Lisa Martinelli, Esq ("Ms. Martinelli"), General Counsel, EOHHS and Jacqueline Kelley ("Ms. Kelly"), Associate Director, RIDOH, advised RIQI of their continuing concern that RIQI was allowing the unapproved use of HIE data for research. In support, the letter referenced an October, 2023 letter from Ms. King and Ms. Powell to RIQI which "details the statutory, regulatory, and contractual provisions restricting the use of HIE data for research."

80. The State's May 23, 2024 letter further advised RIQI that "the continued unauthorized use of HIE data for research is a serious violation of the terms and conditions set forth by the State. RIQI's actions demonstrate a blatant disregard for the State's directives and the trust placed in your organization to handle confidential healthcare information responsibly".

81. The State's May 23, 2024 letter instructed the RIQI to "immediately cease and desist from any further use of HIE data for research purposes" and that RIQI's "failure to comply with this demand will result in legal action to protect the State's interests and the privacy rights of its citizens." Moreover, the letter "require[d] that Ms. Morris resume compliance meetings and activities with the State."

82. Shortly thereafter, at a Rhode Island HIE Advisory Commission ("RIHIEAC") meeting on June 27, 2024, Ms. King discussed the State's ongoing objection to Dr. Sarkar's unauthorized use of HIE data, including that Brown had obtained NIH grants to conduct research using unapproved HIE data. In presenting their objection to RIQI's misuse of the HIE data, the State used a slide-deck.

83. On July 1, 2024, Dr. Sarkar called Ms. Morris to a meeting. At that meeting, Dr. Sarkar and RIQI's counsel proceeded to interrogate Ms. Morris as to her involvement in the HIE

13

data concerns that were addressed by the State at the June 27, 2024 RIHIEAC meeting and whether Ms. Morris was in possession of the slide-deck used at the meeting.

84. Despite having ignored Ms. Morris' previous requests for a follow-up meeting with Mr. Berson, on July 10, 2024, Mr. Berson arranged to meet with Ms. Morris.

85. At this July 10, 2024 meeting, Ms. Morris reiterated the State's continuing opposition to Dr. Sarkar's use of HIE data. Ms. Morris advised Mr. Berson that the matter was addressed at the recent June 27, 2024, RIHIEAC meeting.

86. During the meeting, Mr. Benson requested that Ms. Morris provide him with a copy of the slide-deck used by the State at the June 27, 2024 meeting, which Ms. Morris did.

87. In an attempt to silence Ms. Morris, Mr. Berson urged Ms. Morris to "let it go" and to "let the attorney's take it from here."

88. Among her reports, Ms. Morris advised EOHHS that RIQI was converting HIE data to the Observational Medical Outcomes Partnership (OMOP) common data model for future use by Brown. She reported that Dr. Sarkar had committed the use of HIE data in NIH grants despite the fact that he had not received internal compliance review by Ms. Morris nor prior approval by the State to do so; and that Dr. Sarkar had advised Ms. Morris that the HIE data he provided to Brown now belongs to Brown "to do with it what they wanted."

89. In response to Ms. Morris's reports to EOHHS, by letter dated July 12, 2024, Ms. Martinelli and Ms. Kelley again advised RIQI of their continuing objection to Dr. Sarkar's misuse of HIE data for unauthorized research. In questioning the veracity of Dr. Sarkar's claim that neither he nor RIQI had any involvement in the decision to release the student's manuscript referenced above, and in response to Dr. Sarkar's claim that the decision to do so was Brown's alone, Ms. Martinelli and Ms. Kelly responded: "Despite what we perceived as a clear directive,

RIQI's explanation that the decision to release the [April 26] manuscript was Brown University's alone and no one from RIQI was involved in this decision defies credulity given the dual roles of RIQI's President and Chief Executive Officer, Dr. Neil Sarkar, and the confidentiality obligations of RIQI as a state vendor."

90. The July 12, 2024 letter further states: "…RIQI has a statutory obligation to safeguard this data and 'not permit any other person or entity to use or disclose the Confidential Information.'", quoting 220-RICR-30-00-13.17(D)(2).

91. In particular, the July 12, 2024 letter demands that RIQI cease "…active ongoing work to convert HIE data to the Observational Medical Outcomes Partnership model for future use by Brown…"; that RIQI "provide [the State] with copies of all legal agreements between RIQI and any third parties that include access, use, or disclosure of data obtained during the course of functions as the RHIO…"; and that RIQI "…confirm that extant data with no expiration date [previously received by Brown through past HIE data requests] is either destroyed or returned to RIQI."

92. Thereafter, RIQI's retaliatory conduct directed at Ms. Morris continued, leading up to and culminating in the termination of her employment on July 29, 2024.

93. On July 29, 2024, Ms. Morris was called to a meeting with Dr. Sarkar and Ms. Serradas. Ms. Morris was advised that her employment at RIQI was terminated, effective immediately.

94. The facts of this matter clearly establish that the Defendant retaliated against the Plaintiff in violation of the anti-retaliation provisions of the FCA, RIFCA and in violation of the RIWPA.

95. The Defendant, by its individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, violated the anti-retaliation provisions of the FCA and RIFCA insofar as the Defendant retaliated against the Plaintiff because the Plaintiff investigated and reported matters that she reasonably believed could lead to a viable FCA and RIFCA actions and because the Plaintiff engaged in efforts to stop violations of the FCA and RIFCA.

96. The Defendant, by its individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, violated the RIWPA insofar as the Defendant discriminated against the Plaintiff because the Plaintiff reported violations of state law and regulation to her supervisor and to EOHHS; because the Plaintiff refused to violate state laws and regulations; and because the Plaintiff was requested by EOHHS to participate in an investigation or inquiry by EOHHS.

97. The acts and/or omissions of the Defendant as aforesaid were grossly negligent, reckless, deliberate, intentional, malicious, deceitful, wanton, willful, and/or in bad faith.

98. As a proximate result of the Defendant's unlawful acts and/or omissions, including, but not limited to, those described herein, the Plaintiff suffered loss of income, as well as employment benefits, damage to her business and personal reputation, mental and physical anguish, pain and suffering, and was otherwise injured and damnified.

## VI. Claims for Relief

99. Plaintiff incorporates the allegations contained in ¶¶1 through ¶¶98 above in the counts set forth below.

### Count One
### Violation of the False Claims Act, 31 U.S.C. §3730(h)

100. Ms. Morris is an "employee" as the term is defined by the False Claims Act ("FCA").

101. Ms. Morris engaged in protected conduct under the FCA by investigating and reporting matters that she reasonably believed could lead to a viable FCA action and by engaging in efforts to stop violations of the FCA.

102. Defendant RIQI was on notice of Ms. Morris' protected conduct.

103. Because Ms. Morris engaged in protected conduct, Defendant RIQI retaliated against her leading up to and culminating in the abrupt termination of her employment, causing her to suffer damages.

### Count Two
### Violation of the Rhode Island False Claims Act, R.I. G. L. §9-1.1-4(g)

104. Ms. Morris is an "employee" as the term is defined by the Rhode Island False Claims Act ("RIFCA").

105. Ms. Morris engaged in protected conduct under the RIFCA by investigating and reporting matters that she reasonably believed could lead to a viable RIFCA action and by engaging in efforts to stop violations of the RIFCA.

106. Defendant RIQI was on notice of Ms. Morris' protected conduct.

107. Because Ms. Morris engaged in protected conduct, Defendant RIQI diminished

her role and responsibilities, prevented her from performing her job duties, and abruptly terminated her employment and otherwise retaliated against her, causing her to suffer damages.

### Count Three
### Violation of Rhode Island Whistleblowers' Protection Act , R.I.G.L. §§ 28-50-1 et seq.

108. Defendant RIQI, by its acts and/or omissions, including but not limited to those described herein, violated the Rhode Island Whistleblowers' Protection Act insofar as Defendant RIQI discriminated against Ms. Morris for opposing and reporting what she reasonably believed to be violations of law, rules, and/or regulations promulgated under federal and state law, and because she assisted the State of Rhode Island in its inquiry and/or investigation of RIQI's unlawful conduct, causing Ms. Morris to suffer damages.

### VII. Prayers for Relief

**WHEREFORE**, Plaintiff prays for relief from this Honorable Court as follows:

a. For treble damages based on violations of R.I.G.L. §28-50-1 *et seq.*;

b. For two times the loss of salary and other valuable benefits for violations of 31 U.S.C. §3730(h) and R.I.G.L. §9-1.1-4(g);

c. For additional economic losses and costs incurred by Plaintiff in establishing her claims against Defendant;

d. Compensatory damages including, but not limited to, pain and suffering, emotional distress and reputational damage;

e. For reinstatement with full seniority or, in lieu thereof, full front pay and benefits for Plaintiff;

f. For attorney's fees according to law;

g. Any other such relief that the Court may deem just and equitable.

### VIII.   Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

### IX.   Designation of Trial Counsel

Plaintiff hereby designates Louise A. Herman, Esquire, as trial counsel.

                        PLAINTIFF,
                        By her attorney,
                        HERMAN LAW GROUP

                        */s/ Louise A. Herman*
                        _____
                        Louise A. Herman, Esq. (#6430)
                        1445 Wampanoag Trail, Suite 104
                        E. Providence, RI 02915
                        (401) 277-4110
                        (401) 433-0139 (fax)
                        Email: lherman@lhermanlaw.com

Dated:  January 3, 2025

## VERIFICATION

I, Darlene Morris, first being duly sworn upon oath, do certify as follows: I am the Plaintiff in this action. I declare under penalty of perjury under the laws of the State of Rhode Island that I have read the above Verified Complaint and I know of my own knowledge that the facts recited therein are true, except as to those assertions stated upon information and belief, and as to those assertions, I believe them to be true.

*Darlene Morris*
Darlene Morris

Subscribed and sworn to me in the ~~City of East Providence~~ Town of Barrington, State of Rhode Island, this 3rd day of January, 2025.

Notary Public: _____

My commission Expires: 09-12-2026

GEORGE HADDAD
NOTARY PUBLIC
STATE OF RHODE ISLAND
MY COMMISSION EXPIRES SEPT. 12, 2026

20